**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| Thomas D. Rogers, III, and | ) | Civil Action No. 2:07-3998-CWH |
| Victoria A. Rogers, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| Stewart Title Guaranty Company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The plaintiffs, Thomas D. Rogers, III, and Victoria A. Rogers, filed this declaratory

judgment action seeking a determination that the defendant, Stewart Title Guaranty Company,

was obligated to indemnify them for a claimed loss, pursuant to the title insurance policy it

issued to the plaintiffs on June 9, 1999, in connection with their purchase of a 3.782 acre parcel

of waterfront property in Mount Pleasant.

On February 17-18, 2009, this matter was tried before the undersigned, sitting without a

jury. At the Court's request, the parties have submitted proposed findings of fact and

conclusions of law. After hearing the testimony, gauging the credibility of the witnesses, and

reviewing the exhibits, the evidence presented, and the briefs submitted by the parties, the Court,

pursuant to Rule 52 of the Federal Rules of Civil Procedure, makes the following Findings of

Fact and Conclusions of Law. To the extent that any findings of fact constitute conclusions of

law, or vice-versa, they shall be so regarded.

All exhibits referred to herein were received into evidence at the trial of the case.



## FINDINGS OF FACT

1.      The defendant, Stewart Title Guaranty Company ("Stewart Title), is a corporation

        licensed and existing under the laws of the State of Texas and which does business in

        Charleston County, South Carolina through the sales of title insurance policies. (Ans. ¶

        3).

2.      The plaintiffs, Thomas D. Rogers, III, and Victoria A. Rogers ("Mr. and Mrs. Rogers" or

        "the Rogers"), moved to Mount Pleasant, South Carolina, in 1989. Thereafter, they

        became aware of a large piece of undeveloped land (hereinafter, "Lot A") on high ground,

        overlooking Molasses Creek.

3.      At some time in 1995 or 1996, Mr. and Mrs. Rogers asked Chad Drayton, a friend and

        realtor, about Lot A. Mr. Drayton told them that it was owned by Dorothy Ayers, who

        lived in California, and that it was not available for sale.

4.      One day in early 1999, Mrs. Rogers saw workers operating construction equipment on

        Lot A. Mrs. Rogers stopped and spoke to either Jack DeStefano or Charles M.

        Brandenburg, who told her they were clearing property and preparing to lay infrastructure

        to put in fifteen to twenty houses. Mrs. Rogers told her husband that the property was

        being developed.

5.      Jack DeStefano and Charles Brandenberg were partners in Remley Point Development,

        LLC ("RPD, LLC").

6.      Mr. Rogers visited Lot A and found it so overgrown with deer vines and other vegetation

        that very little of it could be explored. The property looked like a dump, with old tires,

        stoves, refrigerators without doors, piles of roof shingles and other construction debris,

and areas containing trash and bottles from parties in the woods. Mr. Rogers saw one

grave with a headstone dated 1989, located on a bluff of land near Molasses Creek. The

grave did not have any fencing around it, or flowers on it, or paths leading to it. There

was no evidence that the grave was being visited or tended. The property was so

overgrown that neither he nor Mrs. Rogers could walk through it.

7.      At trial, Mr. Rogers identified six photographs of the site which showed the property in

the condition that he saw it prior to their purchase of it on June 9, 1999. (See Pls.' Trial

Ex. 2 (collectively)). The parties stipulated that these photographs were taken in March

1999.

8.      These six photographs show dense undergrowth and woods, and a cleared area with old

tires and household debris, including a stove, along with plywood, asphalt, and other

trash. One gravestone is seen in the photograph with the asphalt debris, and a second

gravestone is partially overgrown in a photograph showing construction debris such as

shingles, a tire, and other trash.

9.      On April 20, 1999, Mr. Rogers and RPD, LLC entered into an "Agreement to Buy and

Sell" (the "Purchase Agreement"), whereby Mr. Rogers agreed to purchase, and RPD,

LLC agreed to sell, Lot A for the price of $1,140,000. (Pls.' Trial Ex. 1).

10.     The Purchase Agreement described Lot A as "[a]pproximately, five acres of undeveloped

land." (Pls.' Trial Ex. 1).

11.     Paragraph 8 of the Purchase Agreement, titled "Special Stipulations," stated in part:

        1.  Seller will provide a plat and survey of property that meets [the] understanding of
            buyer and seller.
            . . . .

#3
Coff.

5. Buyer is responsible for moving any graves on the property.

(Pls.' Trial Ex. 1).

12.    With respect to Special Stipulation #1, a plat was prepared for RPD, LLC by A. H. Schwacke and Associates, Inc., dated May 18, 1999, and titled "PLAT SHOWING THE RESUBDIVISION OF LOTS 147 148 149 & GRAVE YARD SITE INTO LOTS A, B & C REMLEY POINT SCANLONVILLE" which showed Lot A as containing 3.782 acres. (the "May 1999 Schwacke Plat") (Pls.' Trial Ex. 18).

13.    Because this plat showed that Lot A was not five acres, but approximately three and three-quarter acres, the price of the property was reduced from $1,140,000 to $1 Million.

14.    With respect to Special Stipulation #5, prior to the closing on Lot A, Mr. and Mrs. Rogers had been to the site cumulatively between four and five times.  Mr. Rogers had seen one gravestone on the bluff near the edge of Molasses Creek, and Mrs. Rogers had seen three gravestones or grave markers on Lot A.

15.    At the time Mr. Rogers made the offer to purchase in April 1999, he had not seen any plat, or drawing, or document which contained any reference to graves, or a grave site, or a cemetery, or a graveyard.

16.    The plaintiffs planned to purchase Lot A, build one home on the property, and relocate the graves into one graveyard on the property that could be visited.  (Def. Trial Ex. 16 (Pls.' Answers to Request to Admit # 8)).

17.    Prior to closing on Lot A, Mrs. Rogers visited Lot A with Chad Drayton. Charles

Brandenburg, as well as a man named Don, from a funeral home,[1] were there, and they

told her that there were graves on the property and that they were trying to get a sense of

how many graves had to be moved. They told Mrs. Rogers there were "15-25-ish" graves

on the property, which would be relocated at a cost of about $1,100 per grave. Mrs.

Rogers reported this information to Mr. Rogers.

18.    Mr. Rogers retained attorney Charles S. Goldberg ("Mr. Goldberg"), of the Steinberg Law

Firm, to represent him and his wife in connection with the purchase and closing on Lot A.

19.    Prior to the closing, Mr. Rogers and Mr. Goldberg discussed the presence of graves on

Lot A and also discussed the procedure for moving abandoned graves.

20.    Mr. Goldberg told Mr. Rogers that he would not get involved in moving the graves

because he was concerned about what would happen if the Town of Mount Pleasant did

not permit it.

21.    Mr. Goldberg spoke with the attorney for the Town of Mount Pleasant about the

applicable procedures for moving graves, and was referred to S.C. Code § 27-43-10,

governing the removal of abandoned cemeteries. Mr. Goldberg provided Mr. Rogers

with the statute on May 17, 1999. (Pls.' Trial Ex. 4).

22.    Mr. Rogers reviewed the statute and believed it applied to his situation because the graves

appeared to be abandoned, as they were not maintained, but overgrown with dense brush

---

[1]    This person was identified by the defendant's counsel as Don DeRosa, from
Stuhr's Funeral Home.



and vines. Although he asked several churches on Remley's Point about the graves, he could not determine that there was any relationship between the churches and the graves.

23.     After considering all of the evidence presented at trial, including the testimony and the photographs of the condition of Lot A, the Court finds that a reasonable person, having the same knowledge as Mr. and Mrs. Rogers, would believe that the graves had been abandoned.

24.     Mr. Goldberg told Mr. Rogers that there would be costs involved in moving the graves, and Mr. Rogers assured Mr. Goldberg that he knew he was responsible for those costs.

25.     Mr. Rogers and Mr. Goldberg had no discussion as to whether the graves were a title risk.

26.     Mr. Rogers did not consider the graves to be an impediment to the title, but he knew he was responsible for bearing the cost of moving what he thought were abandoned graves on Lot A.

27.     Mr. Goldberg testified that Mr. Rogers told him that there were only a "very few graves"– two or three" – that had been seen on Lot A.

28.     Mr. Goldberg testified that RPD, LLC's attorney, Mike Burkett, told him that there were only a few graves on Lot A.[2]

29.     Mr. Goldberg purchased the back title for Lot A from Mr. Burkett and hired a title abstractor to bring it up to date. As part of the title work, he obtained a copy of a plat labeled "A portion of the tract of land known as Remley Point, laid out into lots and now called Scanlonville" by John A. Michel, dated February 14, 1870, revised December 1894

---

[2]     Mr. Burkett was deceased at the time of trial.

#6
Cebh.

by H.S. Lambol, recorded in Plat Book D, Page 180 in the RMC Office for Charleston County (the "1870 Plat"). (Pls.' Trial Ex. 8).

30. The 1870 Plat showed a "grave yard" marked to the north of Lots numbered 143–151. (Pls.' Trial Ex. 8).

31. Mr. Goldberg did not give the 1870 Plat to Mr. Rogers or discuss it with him. Mr. Rogers did not see the 1870 Plat with the "grave yard" on it until several months after the closing. Mrs. Rogers never saw the 1870 Plat.

32. After reviewing Mr. Burkett's back title and the title work the abstractor performed, Mr. Goldberg identified one title problem – a 1908 Master's Deed provided for an ingress/egress easement to a burial ground for the Clement Prince family.[3] (Pls.' Trial Ex. 19).

33. Mr. Goldberg was never able to determine the location of the easement granted to the Clement Prince Family (the "Prince Family Easement") on the 1870 Plat.

34. Mr. Goldberg believed that the graves that Mr. Rogers told him about were the Prince Family graves.

35. Mr. Goldberg believed that the "grave yard" marked on the 1870 Plat referred to the Prince Family graveyard.

36. The 1870 Plat refers to a "grave yard" – it does not refer to a public graveyard.

37. Mr. Goldberg told Mr. Rogers that the Prince Family Easement was a title issue.

---

[3]    The 1908 Master's Deed into Charleston Land Company contained an easement that expressly reserved to the heirs and family of Clement S. Prince, one of the original owners of the property, the right of ingress and egress to the burial grounds and the right to burial in the Prince Family Graveyard. The Master's Deed was recorded in Book H-25, Page 497 in the Register of Mesne Conveyances for Charleston County.



38.    Mr. Goldberg contacted in-house counsel for Stewart Title, Mr. Barry Sloop, prior to the June 9, 1999 closing and talked to him about the presence of graves and the existence of the Prince Family Easement.

39.    Mr. Goldberg faxed a copy of the Prince Family Easement to Stewart Title prior to closing. Because of the existence of the Prince Family Easement, Stewart Title instructed Mr. Goldberg to put an exception in for graves. There was no discussion regarding including an exception for a graveyard.

40.    Although Stewart Title has specific rules regarding cemeteries, it did not take an express exception to the "grave yard" site.

41.    On May 6, 1999, RPD, LLC's attorney, Mr. Burkett, faxed Mr. Goldberg's paralegal an enlargement of that portion of the 1870 Plat showing the "grave yard" immediately north of Lots 143-151. (Pls.' Trial Ex. 7).

42.    Mr. Goldberg did not see this faxed document until the week before the trial of this case.

43.    On June 1, 1999, the May 1999 Schwacke Plat was approved by the Town of Mount Pleasant (the "Final Schwacke Plat"). The Final Schwacke Plat is titled "Plat Showing Resubdivision of 147, 148, 149, & Grave Yard Site Into Lots A, B & C Remley Point Scanlonville" and contains the notation "Grave Yard Site" in the lower right hand corner of Lot A. (Pls.' Trial Ex. 18).

44.    The notation regarding the "grave yard site" on the Final Schwacke Plat was not located where Mr. and Mrs. Rogers had seen the gravestones or grave markers, nor was it located where the Charleston County Master-in-Equity later found the public graveyard to be located.



45.    Neither Mr. Rogers nor Mrs. Rogers walked through the interior of Lot A prior to the

       June 9, 1999 closing.

46.    Prior to the closing, Mr. and Mrs. Rogers did not know the exact number or location of

       the graves on Lot A.  They had been told by Mr. Brandenberg, a partner in RPD, LLC,

       that there were about 25 graves.

**The closing on June 9, 1999**

47.    Mr. Goldberg testified that Mr. and Mrs. Rogers saw the Final Schwacke Plat before they

       closed on June 9, 1999.  (Pls.' Trial Ex. 18).

48.    Mr. Rogers testified that, at the time of the closing, he had not seen any map or drawing,

       or any document, which contained any notation or reference to graves, or to a grave site,

       or to a public graveyard.

49.    Mr. Rogers attended the closing on June 9, 1999.  He did not know the people associated

       with RPD, LLC, except by name.

50.    At the closing, RPD, LLC conveyed title in fee simple to Lot A to the plaintiffs for $1

       Million.  The deed described the real property as follows:

> All that certain piece, parcel or tract of land, situate, lying and being in
> the Town of Mt. Pleasant, State of South Carolina, and bing [sic] show
> [sic] and designated as LOT A, 3.782 Acres on a plat entitled "PLAT
> SHOWING THE RESUBDIVISION OF LOTS 147 148 149 & GRAVE
> YARD SITE INTO LOTS A, B, & C REMLEY POINT
> SCANLONVILLE CHARLESTON COUNTY SOUTH CAROLINA"
> dated May 18, 1999, revised May 26, 1999, prepared by A. H. Schwacke
> & Associates and being recorded simultaneously herewith.  Reference to
> said plat is craved for a complete description [sic] said property.
>
>         This being a portion of the property conveyed to Remley Point
> Development, LLC by deed of Dorothy Rausch Ayers dated and recorded
> simultaneously herewith[.]

Page 9 of  30

(Pls.' Trial Ex. 14).

51.     Mr. Rogers does not specifically recall reviewing the deed at or prior to closing, nor did

he specifically recall the property description as referring to a "grave yard site."

**The Title Policy**

52.     Mr. Goldberg is a principal in Trident Title Insurance Agency and was authorized by

Stewart Title to act as its agent to issue Stewart Title insurance policies.

53.     Effective June 9, 1999, Trident Title Insurance Company issued Stewart Title Residential

Title Insurance Policy (# O-9917-217314) (the "Title Policy") in the amount of $1

Million to the plaintiffs which insured title in fee simple in the land known as Lot A, as

shown on the Final Schwacke Plat and consisting of 3.782 acres.  (Pls.' Trial Ex. 5).

54.     The Title Policy insured the plaintiffs "against actual loss resulting from: any title risks

covered by this Policy—up to the policy Amount[.]"  (Pls.' Trial Ex. 5 at 1).

55.     The Title Policy provided coverage for "actual loss or the Policy Amount [$1,000,000] in

force when the claim is made – whichever is less."  (Pls.' Trial Ex. 5 at 5, Condition 6).

56.     The Title Policy insures the plaintiffs against risks to "fee simple title," and provides

coverage for enumerated "risks, if they affect your title on the Policy Date."  These title

risks include:

> "[s]omeone else owns an interest in your title;"
>
> "[s]omeone else has an easement on your land;" or
>
> "[o]ther defects, liens, or encumbrances."

(Pls.' Trial Ex. 5 at 1).



57. The Title Policy defines "Easement" as "the right of someone else to use your land for a special purpose." (Pls.' Trial Ex. 5 at 2 (Definition 1.a.)).

58. The Title Policy does not define the terms "other defects, liens or encumbrances."

59. Schedule B of the Title Policy listed certain exceptions to coverage. One exception was for the Prince Family Easement, described in Schedule B as the "Ingress/egress easement recorded in Book H-25, Page 497, Charleston County records." (Pls.' Trial Ex. 5 at 4).

60. By incorporating the exception for the Prince Family Easement into the Title Policy, Mr. Goldberg intended to except the graves themselves, and the Prince Family Graveyard, and the access to and from the Prince Family Graveyard.

61. Mr. Goldberg testified, and the Court finds, that other than the Prince Family Easement referenced above, Schedule B of the Title Policy does not contain an exception for or an exclusion to a "grave yard site," or to a graveyard or a publicly dedicated grave yard.

62. The Title Policy further states: "In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from: . . . 3. Title Risks: that are created, allowed or agreed to by you that are known to you, but not to us, on the Policy Date–unless they appeared in the public records . . . that first affect your title after the Policy Date . . .[.] (Pls.' Trial Ex. 5 at 2).

63. The Title Policy does not define the terms "created, allowed or agreed to".

64. The exclusion regarding risks that are "created, allowed or agreed to by you" is referred to as the "3(a) exclusion."

65. Stewart Title's 30(b)(6) witness, Susanne Hawkins, testified that Stewart Title denied coverage based on the 3(a) exclusion.

**After the closing**

66.    Mr. and Mrs. Rogers hired a crew of workers to clear Lot A, at a cost of over

$150,000.00.  Mr. and Rogers also hired landscape architect Sheila Wertimer to design a

graveyard where the graves would be relocated.

67.    Mr. and Mrs. Rogers commissioned a survey of the property.  The topographic survey,

dated May 1, 2000, showed 85 graves (with headstones, posts, slabs, or metal markers)

scattered over Lot A, as well as scattered apparent graves, as indicated by depressions in

the soil.  (Def.'s Trial Ex. 15).

68.    The Court finds as a fact that while the plaintiffs were aware at the time of closing that

there were approximately twenty-five graves on Lot A, the vast majority of the graves

were discovered after the June 9, 1999 closing.

69.    Mr. Rogers retained an attorney for the purpose of removing the graves pursuant to S.C.

Code § 27-43-10, and on or about March 30, 2001, the attorney gave public notice in the

Charleston Post and Courier of the proposed removal and relocation of the graves.

70.    At a public meeting held at a local church on April 28, 2001, Mr. and Mrs. Rogers

learned of the local community's vehement opposition to any attempt to relocate the

graves.

71.    On October 30, 2001, Mr. and Mrs. Rogers appeared before the Mount Pleasant Planning

and Development Committee to present their plan to build a single family home on the

property, and presented a professionally-drawn plan to remove and relocate the graves,

pursuant to the process set forth in S.C. Code Ann. § 27-43-10, and dedicate a portion of

their property for a cemetery.

72.    The Mount Pleasant Planning and Development Committee recommended approval of the petition to relocate the graves, but at the final hearing on the petition before the Town Council on November 13, 2001, members of the community voiced their strong opposition to the relocation of the graves. (Def.'s Trial Ex. 17).

73.    On November 13, 2001, the plaintiffs withdrew the petition from consideration. Also on November 13, 2001, Mr. and Mrs. Rogers, RPD, LLC, and Dorothy Ayers were sued in the Court of Common Pleas for Charleston County by the East Cooper Civic Club and a number of individuals alleging that the Rogers' property had been used for 130 years as a community burial ground, that their relatives were buried there, and that they had an interest in being buried there after their deaths (the "Graveyard Action"). (Pls.' Trial Ex. 21).

74.    On June 16-22, 2005, the Graveyard Action was tried without a jury before Charleston County Master-in-Equity Mikell Scarborough (the "Master in Equity"). In an order filed on August 31, 2005, the Master in Equity found that a public burial ground had existed on the Rogers' property since 1870, it had been in use from that time on, and its character was typical of other African America rural burial grounds in the area. The Master in Equity concluded that the graveyard had been publicly dedicated and had never been abandoned. (Pls.' Trial Ex. 22 at 3, 4, 9-11-13).

75.    After post-trial motions to alter or amend the judgment, on February 9, 2007, a final order, by consent of the parties, was signed by the Master in Equity which modified the prior order and held that 2.32 acres of the plaintiffs' 3.782 acre property was a publicly



dedicated graveyard dating back to 1870. The exact boundaries of the 2.32 acre publicly dedicated graveyard were set forth in a plat attached to the order.[4] (Pls.' Trial Ex. 23).

76.    Mr. Rogers testified that his use of Lot A is subject to the publicly dedicated graveyard.

77.    Mr. Goldberg testified, and this Court finds, that the boundaries of the publicly dedicated graveyard were not established until the Master in Equity signed his order with the attached plat.

78.    Mr. Goldberg testified, and this Court finds, that Mr. and Mrs. Rogers intended to purchase fee simple interest in Lot A, and Mr. Goldberg issued the Title Policy which expressly insured their fee simple interest.

79.    Although the Title Policy expressly insured the Rogers' fee simple interest, as a result of the Master in Equity's February 9, 2007 order recognizing the existence of, and setting the boundaries of the public graveyard, the public has a recognized interest in the title as well, because the Master in Equity held that the property was subject to an implied public dedication dating back to 1870. In practical terms, the Court finds that the Master in Equity declared that the public has the non-restricted right to visit the property, any member of the public may bury any other member of the public in the publicly dedicated graveyard (subject only to state regulation regarding burials methods), and the public has the right not to have the graves desecrated or disturbed.

80.    Mr. Goldberg testified that before the Master in Equity issued his order, there was no information in the public record, or anywhere else, that would have indicated that there

---

[4]    The February 9, 2007 stated that the parties had agreed not to appeal, thus making this the final date of the order. The order was filed on February 23, 2007.



was a publicly dedicated graveyard in the specific area that was so found.  Mr. Goldberg
has practiced real estate law in the Charleston area for over 50 years, and the Court finds
his testimony credible.

81.    Mr. Goldberg testified, and this Court finds, that the Master concluded in <u>dicta</u> that the
2.32 acre publicly dedicated graveyard was not the Prince Family Burial Ground accessed
by the Prince Family Easement.

82.    Mr. Goldberg testified, and this Court finds, that except for the Prince Family Easement,
the Title Policy does not contain a specific exception or exclusion for a burial ground or a
graveyard.

**Mr. Thomas Hartnett, the plaintiffs' expert witness**

83.    Mr. Thomas Hartnett, a Charleston real estate appraiser, was admitted as the plaintiffs'
expert without objection.  Mr. Hartnett reviewed comparable sales of waterfront
properties in the area and inspected Lot A several times.

84.    He prepared an appraisal of the difference in value of Lot A as of the date of the Master
in Equity's February 9, 2007 order without the publicly dedicated graveyard, and with the
publicly dedicated graveyard.  (Pls.' Trial Ex. 24).

85.    Mr. Hartnett opined that as of February 9, 2007, Lot A, fee simple and unencumbered by
the publicly dedicated graveyard, had a fair market value of $2,364,000.00.  Mr.
Hartnett's fair market value of $2,364,000.00 assumed the cost of the graves being
moved.



86.     Mr. Hartnett opined that as of that same date, Lot A, encumbered with the publicly dedicated graveyard, had a fair market value of $190,000. The difference in those two values equals $2,174,000.00.

87.     Mr. Hartnett testified that it did not matter how many graves were present on Lot A – the crucial fact was that the Master in Equity had determined that a publicly dedicated graveyard was located on Lot A.

88.     Mr. Hartnett did not assign a monetary value to the publicly dedicated graveyard because he was not aware of any instance where a publicly dedicated graveyard had been bought or sold.

89.     Mr. Hartnett testified, and this Court finds, that the publicly dedicated graveyard at issue has no market value.

90.     Mr. Hartnett opined that it was "common" for people in the Charleston area to purchase property with graves and move the graves to a different location on the property or off of the property. He testified as to three specific instances where properties with graves had been purchased and the graves had been moved thereafter.

91.     He stated that almost every major large tract of land in Low Country, South Carolina, has some graves.

92.     Mr. Hartnett described two methods of appraising property with graves: (1) if the property is a larger tract, excluding the acreage of the graves from the overall acreage, or (2), if the property is a smaller tract, determining the cost of moving the graves to another site, and then deducting that cost from the market value of the property.



93.    Mr. Hartnett testified that waterfront property in Mount Pleasant, South Carolina appreciated greatly between 1999 and 2007, and the increase from $1 Million to his market value figure of over $2.3 Million some seven years later appeared to be a reasonable appreciation figure.  Further, Mr. Hartnett testified that his valuation of the remainder of Lot A at $190,000 as of February 9, 2007 compared with the Defendant's expert's valuation of the same remainder in June 1999 at $164,000 was consistent because of the appreciation of property values in that area.  The waterfront portion of Lot A is more valuable, and would have appreciated at a greater rate.  The remainder of Lot A would not have appreciated as quickly because of its location.

94.    The Court finds Mr. Hartnett to be a well-qualified, competent and credible witness, and adopts his conclusions that Lot A, without the publicly dedicated graveyard, had a market value of $2,364,000 on February 9, 2007, and that Lot A, encumbered by the publicly dedicated graveyard, as of the same date, had a market value of $190,000.

95.    The Court also finds that while the plaintiffs did not know the exact number of grave sites at the time of the purchase, there were approximately 85 grave markers on Lot A as of June 9, 1999, as illustrated in the topographical survey commissioned by the Rogers in 2000.  Further, according to Mrs. Rogers, they understood at the time of their purchase of Lot A, it would cost approximately $1100 per grave to move the graves.

**The defendant's expert, Mr. Joseph G. McInerney, III**

96.    Mr. Joseph G. McInerney, III, a licensed South Carolina Certified General Real Estate Appraiser, was qualified as the defendant's expert and offered testimony of the

retrospective value of the subject property as of the date of closing, June 9, 1999. (Def.'s Trial Ex. # 12).

97.    Mr. McInerney appraised Lot A as of June 9, 1999, using the highest and best use, as $164,000.00, and testified that the plaintiffs had overpaid for the property by $836,000.00.

98.    The $164,000 figure does not take into account the 2.32 acres delineated as the public graveyard in 2007.  Mr. McInerney opined that the area encumbered by the graves is without market value both now and at the time of purchase.  However, he conceded that there would have been no way to determine the boundaries of the publicly dedicated graveyard until the Master in Equity's plat had been filed.

99.    Mr. McInerney testified that the highest and best use of the remainder property consisted of re-subdividing this unencumbered area into three lots so as to maximize the value to the owner.

100.    The plaintiffs have challenged the defendant's expert opinion based on Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).  The Court takes into account that Mr. McInerney only used information which post-dated the plaintiffs' June 9, 1999 purchase in order to conclude there was a public graveyard on the property and reach the conclusion as a result that as of June 9, 1999, the property only had a market value of $164,000.  The Court finds that the testimony of Mr. McInerney does not address the fact that the date of loss was February 9, 2007. Therefore, while the Court is not excluding the testimony on the basis of Daubert and

<u>Kumho Tire</u>, the Court discounts the weight of the testimony greatly because the opinions do not address the relevant valuation date.

101. Furthermore, the Court also discounts the value of Mr. McInerney's expert testimony because his appraisal assumes that Mr. and Mrs. Rogers agreed to the presence of the graveyard. To the contrary, as the evidence shows, the Rogers agreed to purchase 3.782 acres of property with between 10-25 graves – the Rogers did not agree to purchase land with a publicly dedicated graveyard encompassing 2.32 acres of the 3.782 acre tract.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332. There is diversity between the plaintiffs, as citizens of South Carolina, and the defendant, Stewart Title, a Texas corporation, and the amount in controversy exceeds $75,000.00.

2. Venue is proper in the Charleston Division of the United States District Court for the District of South Carolina.

3. Rule 52(a)(6) of the Federal Rules of Civil Procedure sets forth the standard of review of actions tried without a jury: "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6).

4. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot



be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985).
The reviewing court "must give due regard to the opportunity of the district court to judge
the credibility of the witnesses." Multi-Channel TV Cable Co. v. Charlottesville Quality
Cable Corp., 65 F.3d 1113, 1122 (4th Cir. 1995). As the Supreme Court has reasoned, a
"trial on the merits should be the main event . . . rather than a tryout on the road."
Anderson, 470 U.S. at 575 (internal quotation marks and citation omitted).

5.    Because this is a diversity case, the Court will apply the substantive law of South
Carolina, the state where the contract was formed, Erie R.R. v. Tompkins, 304 U.S. 64,
78-80 (1938), and will apply South Carolina's choice-of-law rules. See Klaxon Co. v.
Stentor Mgf. Co., 313 U.S. 87, 496 (1941).

6.    The law which governs a contract is the law of the place where the contract is made.
Unisun Ins. Co. v. Hertz Rental Corp., 436 S.E.2d 182, 184 (S.C. Ct. App. 1993). The
title insurance policy was made in South Carolina, and therefore, South Carolina law
governs its interpretation.

7.    In South Carolina, title policies are subject to the rules generally applicable to contracts of
insurance. See First Carolinas Joint Stock Land Bank of Columbia v. N.Y. Title &
Mortg. Co., 174 S.E.2d 402, 406 (S.C. 1934). Insurance contracts are construed in favor
of coverage, and ambiguity or questions of construction will be construed most favorably
to the insured. Id. "Exclusions in an insurance policy are to be interpreted narrowly and
to the benefit of the insured." Horry Cnty. v. Ins. Reserve Fund, 544 S.E.2d 637, 640
(S.C. Ct. App. 2001).



8.      The "purpose of title insurance has been stated as seeking to place the insured in the

position that he thought he occupied when the policy was issued." <u>Stanley v. Atl. Title</u>

<u>Ins. Co.</u>, 661 S.E.2d 62, 65 (S.C. 2008) (citing 46 C.J.S. § 1736).

9.      Thus, "title insurance operates to protect a purchaser or mortgagee against defects in or

encumbrances on title which are in existence at the time the insured takes title." <u>Firstland</u>

<u>Vill. Assocs. v. Lawyer's Title Ins. Co.</u>, 284 S.E.2d 582, 583 (S.C. 1981) (per curiam).

"Title insurance is unique in that it is retrospective, not prospective." <u>Id.</u> "Title

insurance, instead of protecting the insured against matters that may arise during a stated

period after the issuance of the policy, is designed to save him harmless from any loss

through defects, liens, or encumbrances that may affect or burden his title when he takes

it." <u>Id.</u>

10.     The Title Policy provides coverage for certain enumerated "title risks, if they affect your

title on the Policy Date."  These title risks include:

            "[s]omeone else owns an interest in your title;"

            "[s]omeone else has an easement on your land;"

            "[o]ther defects, liens, or encumbrances."

(Pls.' Trial Ex. 5 at 1).

**"Someone else owns an interest in your title"**

11.     The Title Policy does not define this phrase.  The Court has found as a fact that the

Master in Equity held that 2.32 acres of the Rogers' 3.782 acre tract was a publicly

dedicated graveyard which dated back to 1870.  As a result, the public has a recognized

interest in the Rogers' title.



Page 21 of 30

12.    The Court concludes that, based on the Master in Equity's orders, the testimony of the plaintiffs, and the testimony of the defendant, the "title risk" at issue in the case – the publicly dedicated graveyard – fits the risk of "someone else owns an interest in your title."

**"Someone else has an easement on your land"**

13.    The Title Policy defines "Easement" as "the right of someone else to use your land for a special purpose." (Pls.' Trial Ex. 5 at 2 (Definition 1.a.)).

14.    Stewart Title concedes, and this Court concludes, as a matter of law, that the public's recognized interest in the 2.32 acres as a publicly dedicated graveyard constitutes "the right of someone else to use your land for a special purpose" and thus is an easement under the terms of the Title Policy. (Stewart Title Findings of Fact # 19).

**"Other defects, liens, or encumbrances"**

15.    The Court has found as a fact that the Title Policy does not define the terms "other defects, liens or encumbrances." With respect to the terms "defect" and "encumbrance," the Court notes that one treatise has defined a "defect" as "either the absence of some legal requirement or element in a title to assure its validity, or an interest, right, or title in property that is superior to the estate or interest that has been insured, but whose absence or superiority remains undisclosed at the date of the policy's issuance." Barlow Burke, Law of Title Insurance, § 4.04 (2010). The Court concludes, as a matter of law, that the publicly dedicated graveyard falls within the second clause of this definition.

16.    Unbeknownst to the Rogers, the publicly dedicated graveyard existed as of the date of closing.



17.    The publicly dedicated graveyard, the boundaries of which were unknown on the date the Title Policy was issued, is a title defect.

18.    South Carolina law has defined an "encumbrance" as "a right or interest in the land granted 'which may subsist in third persons to the diminution in value of the estate although consistent with the passing of the fee.'" <u>Truck South, Inc. v. Patel</u>, 528 S.E.2d 424, 428-29 (S.C. 2000).

19.    The existence of the publicly dedicated graveyard, the boundaries of which were unknown on the date the Title Policy was issued, constitutes an "encumbrance."

**Whether these risks are covered risks**

20.    The Court next must determine whether these risks ("someone else owns an interest in your title," "someone else has an easement on your land," and "other defects . . . or encumbrances") are "covered" risks under the terms of the Title Policy, or whether these risks were "created, allowed, or agreed to" by the plaintiffs.

21.    This Court finds that the exclusion "created, allowed, or agreed to" is not ambiguous, and thus gives the phrase its ordinary meaning. <u>Investors Title Ins. Co v. Bair</u>, No. 9:05-1434, 2007 WL 67386525, at *6 (D.S.C. Apr. 26, 2007), <u>aff'd</u>, 296 F. App'x 332 (4th Cir. 2008) (unpublished per curiam decision); <u>see also</u> <u>Popiel v. Commonwealth Land Title Ins. Co.</u>, 218 F. App'x. 910, 911 (11th Cir. 2007) (unpublished per curiam decision); <u>ASK Realty II Corp. v. First Am. Title Ins. Co.</u>, 2004 WL 1254005, at *5 (D. Md. June 7, 2004); <u>Kachel v. Chicago Title Ins. Co.</u>, 1999 WL 123807, at *1-2 (S.D.N.Y. March 8, 1999); <u>First Am. Title Ins. Co. v. Action Acquisitions, LLC</u>, 187 P.3d 1107, 1113 (S.C. Az. 2008) (en banc). <u>Cf.</u> <u>Chicago Title Ins. Co. v. Resolution Trust Corp.</u>, 53

#23
Ce/A

F.3d 899, 907 (8th Cir. 1995) (construing the exclusion "created, suffered, assumed, and agreed to" to be "ambiguous").

22.    The plaintiffs did not "create" the title risk because they did not bury anyone on Lot A.

23.    The plaintiffs did not "allow" the risk. It is undisputed that between the date the plaintiffs purchased Lot A, and the date of the Master in Equity's February 9, 2007 order, they did not allow any burials on the subject site. Instead, during the pendency of the Graveyard Action, they obtained a preliminary injunction prohibiting burials. Furthermore, it has not been alleged that any burials have been allowed on the property since that time.

24.    This Court next must determine whether the Rogers "agreed to" the presence of a publicly dedicated graveyard on Lot A. Stewart Title argues that the plaintiffs knew of some graves, agreed to move those graves, and agreed to purchase the property – and, the Final Schwacke Plat showed a "grave yard site." According to Stewart Title, the plaintiffs "agreed to" purchase the graveyard.

25.    The Court concludes as a matter of law that the plaintiffs agreed to purchase Lot A with some graves on it. They did not agree to purchase the publicly dedicated graveyard, because no one knew of its presence as of the date of closing. The publicly dedicated graveyard was only so declared as such by the Master in Equity in 2005, and the boundaries were determined by the Master in Equity in 2007.

26.    The plaintiffs agreed to purchase the Prince Family Graveyard, which the Master in Equity determined was not the publicly dedicated graveyard identified in the Graveyard Action.

27.    After comparing the 1870 Plat with the Final Schwacke Plat, the Court makes several

conclusions of law.  First, although the 1870 Plat referenced a "Grave yard" in the area of

Lot A, the boundaries of the "Grave yard," as drawn on the 1870 Plat, do not correspond

to the boundaries of the graveyard as determined by the Master in Equity's plat.  Second,

portions of the area marked as the "Grave yard" on the 1870 Plat contain no graves at all,

and the shape of the relevant land mass in the area where the "Grave yard" notation

appears is not the same shape as the land mass that appears on the Final Schwacke Plat.

In fact, this plat contains no reference to a public graveyard.  Although the words "grave

yard site" are noted in small type in the lower right-hand corner in the Final Schwacke

Plat, that location does not illustrate the public graveyard determined by the Master in

Equity.

28.    Mr. Goldberg testified that, prior to closing, he received a copy of the 1870 Plat with the

"Grave yard" notation, but that he did not discuss the 1870 Plat with Mr. and Mrs.

Rogers.  Mr. Rogers testified that he did not see this plat until several months after the

closing.

29.    Mr. Rogers further testified that he and Mrs. Rogers never saw the Final Schwacke Plat at

closing.  Therefore, the Court concludes, as a matter of law, that the Rogers had no

knowledge, on June 9, 1999, of the notation concerning the "grave yard" on either the

1870 Plat or the Final Schwacke Plat.

30.    At the time Mr. and Mrs. Rogers closed on Lot A, they had actual knowledge of

approximately 25 graves, and they had observed the overgrown condition of the property

and the seemingly abandoned gravestones amidst the construction rubbish.

Page 25 of 30

31.    Mr. Goldberg testified that there was nothing in the back title that indicated the existence of a public graveyard, and that the language of the "Prince Family Easement" referred to a private burial ground reserved to heirs of a prior plantation owner.  Moreover, the Master in Equity's February 9, 2007 order, in <u>dicta</u>, found that the Prince Family burial ground was not located on Lot A, and therefore was not the publicly dedicated graveyard delineated by the plat attached to the February 9, 2007 order.

32.    The Court concludes, as a matter of law that, prior to the Master in Equity's February 9, 2007 order, the exact boundaries of the publicly dedicated graveyard were not known to anyone, and, prior to this order, there was no place where anyone could have looked to determine the boundaries of the publicly dedicated graveyard.

33.    This Court concludes that while the plaintiffs agreed to buy Lot A knowing of the presence of some graves, they did not, and could not have agreed to, the presence of, and boundaries for, a 2.32 acre publicly dedicated graveyard as determined by the Master in Equity almost eight years after closing.

34.    The Court concludes as a matter of law that the title risk – that the public (1) owns an interest in Lot A through implied dedication of a public graveyard; and (2) has an easement over Lot A – is a covered risk.

35.    The Court finds that Stewart Title has failed to show by a preponderance of the evidence that Mr. and Mrs. Rogers agreed to the title risk at the time of the issuance of the policy.

**"Known to you"**

36.    The Title Policy includes an exception for title risks "that are known to you, but not to us, on the Policy Date – unless they appeared in the public record."



37.    With respect to "actual knowledge of the title risk at issue," this Court has located one

South Carolina case directly interpreting this exclusion.  In <u>Investors Title Ins. Co v. Bair</u>,

Judge Duffy held:

> A title risk will be said to have been known by an insured when the
> owner of the title insurance policy knew of facts not in the public record
> before the issuance of the policy that would have put a reasonable person
> on notice that there was a likelihood that somebody would come along
> later and challenge his title to the property.  <u>See</u> Joyce D. Palomar, <u>Title</u>
> <u>Insurance Law</u> §§ 6:14, 6:15 (West Group 2004).  Because the language
> of an exclusion will be resolved in favor of the insured and coverage, the
> court finds that the Policy exclusion applies only when an insured has
> actual knowledge of the facts that would have put a reasonable person on
> notice of the title risk which is the subject of the underlying lawsuit.  <u>See</u>
> <u>New York Underwriters Ins. Co. v. Cent. Union Bank of South Carolina</u>,
> 65 F.2d 738 (4th Cir. 1933) (holding that, under a fire insurance policy,
> an exclusion for when mortgagee has "knowledge of change in
> occupancy" is interpreted to require actual knowledge of the change).

2007 WL 67386525, at *6, <u>aff'd</u>, 296 F. App'x 332.

38.    A title insurance company is entitled to avoid payment under a title policy only if the

insured had actual knowledge of the title risk at issue.  <u>Investors Title Ins. Co. v. Bair</u>,

296 F. App'x at 334 (citing <u>N.Y. Underwriters Ins. Co. v. Central Union Bank of S. C.</u>,

65 F.2d 738, 739 (4th Cir. 1933)).

39.    The Court concludes as a matter of law that the plaintiffs did not have actual knowledge

of the facts that would have put a reasonable person on notice of the title risk which is the

subject of the underlying lawsuit.  The Court finds as a matter of law that the plaintiffs

cannot be said to have "agreed to" the existence of a publicly dedicated graveyard,

because its existence as a matter of record was unknown to everyone until the Master in

Equity's 2005 order, and its exact boundaries, as a matter of record, were unknown to

everyone until the Master in Equity's 2007 order.

**Damages**

40.    "A title insurer is generally liable for losses or damages caused by defects in the

property's title, and defects for which title insurance policies provide coverage may

generally be defined as liens and encumbrances that result in a loss in the title's value.

Stanley, 661 S.E.2d at 65 (citing 46 C.J.S. Insurance § 1736 (2007); 43 Am.Jur.2d

Insurance § 528 (2003)).

41.    The Title Policy insures against "actual loss resulting from: any title risks covered by this

Policy – up to the policy Amount." The Title Policy does not define the term "actual

loss." Case law holds that, for a plaintiff to recover under the policy, the loss resulting

from the covered risk must be an actual loss. First Fed. Sav. Bank of Brunswick v.

Stewart Title Guar. Co., 451 S.E.2d 916, 920 (S.C. Ct. App. 1994). "Where litigation has

occurred, as here, there can be no claim or loss until there is an adverse title

determination by a court." Id. at 921.

42.    The adverse title determination occurred on February 9, 2007 – the date that the Master in

Equity's order with the attached plat was signed.[5] The Court finds that prior to this date,

there was no place where one could have looked to determine the boundaries of the

publicly dedicated graveyard.

---

[5]    The trial before Charleston Master-in-Equity Mikell Scarborough took place in 2005, and the court issued its initial order in 2005 declaring the publicly dedicated graveyard. However, motions to alter or amend the master's order were filed and as a result the finality of the 2005 order was delayed until the issuance of the February 9, 2007 order ruling on the motions to alter or amend. The February 9, 2007 order also indicated that the parties had agreed not to appeal, thus making this the final date of the order.



43.    In South Carolina, courts have recognized that the loss of a title's value can be measured

in a variety of ways, depending on the circumstances of the title claim.

> For instance, an owner's loss can be the fair market value of a portion of
> property which has proven completely unmarketable; the cost of
> removing the defect from the property; or the difference in the values of
> the property with and without the defect. The terms of individual
> insurance agreements can control the method of valuation, but the
> purpose of title insurance has been stated as seeking to place the insured
> in the position that he thought he occupied when the policy was issued."

Stanley, 661 S.E.2d at 65 (citations omitted).

44.    The Court concludes that the Rogers' actual loss, as measured by the difference in the

value of Lot A with the title defect and without the title defect on the date of loss is

$2,174,000, reduced by the cost for removing the number of graves they knew about prior

to June 9, 1999, the date that the Title Policy was issued (25 x $1100 = $27,500), for a

final actual loss of $2,146,500.00. The Court finds, however, that any reduction in Mr.

Hartnett's valuation of Lot A without the public graveyard in order to account for the

impact on value for the cost to relocate the known graves would have no impact on the

ultimate conclusion that the actual loss well exceeds the $1 Million policy limit. Further,

even if the Court were to impute knowledge to the Rogers of the 85 grave markers

discovered by the Rogers in 2000, and therefore find that the Rogers assumed

responsibility for the cost of moving those graves, the Court finds that such an assumed

cost would be no more than 85 graves multiplied by the $1100 per grave cost, or $93,500.

Even subtracting $190,000 for the value of the remainder of Lot A and the $93,500

removal costs of actual grave markers on site as of June 9, 1999, the actual loss figure

would still amount to a sum well over $1,500,000 - far above the $1 Million policy limit.

The Court finds that this valuation method comports with the purpose of title insurance of placing the insured in the position that he thought he occupied when the policy was issued.

45.    Because the Title Policy provides that it insures the plaintiffs for their actual loss up to the policy limit, which in this case is $1 Million, the Court declares that the plaintiffs are entitled to recover the full amount of the policy – $1 Million.

46.    The plaintiffs are entitled to a declaratory judgment that the Title Policy provides coverage for their actual loss, and that the plaintiffs' actual loss exceeds the $1 Million policy limit.

**AND IT IS SO ORDERED.**

**C. WESTON HOUCK**
**UNITED STATES DISTRICT JUDGE**

March 31, 2011
Charleston, South Carolina

